# In the United States Court of Federal Claims

No. 09-185 C

(Filed July 17, 2009)[1]

| | |
|---|---|
| RED RIVER HOLDINGS, LLC, | ) |
| Plaintiff, | ) Post-award bid protest; subject matter |
| | ) jurisdiction over maritime procurement; |
| v. | ) failure to comply with solicitation; |
| | ) national security concerns; equitable |
| THE UNITED STATES, | ) relief. |
| Defendant. | ) |

*Marc J. Fink*, Washington, D.C., for plaintiff.  *Heather M. Spring*, of counsel.

*Christopher L. Krafchek,* United States Department of Justice, Washington D.C., with whom were Assistant Attorney General *Tony West*, *Jeanne E. Davidson*, Director and *Deborah A. Bynum*, Assistant Director, Washington, D.C., for defendant. *Gordon D. Ivins* and *Lea E. Delossantos*, Military Sealift Command, of counsel.

---

## OPINION

**Merow**, *Senior Judge*.

This post-award protest arises out of a December 5, 2008 Solicitation Request for Proposals ("RFP") by the United States Department of the Navy, Military Sealift Command ("MSC"),[2] requesting proposals for a charter party[3] of a vessel essentially

---

[1] This Opinion, as now reissued for public access, was originally issued on July 10, 2009, under seal, pending any redactions to be proposed by the parties.  On July 14, 2009, plaintiff submitted its proposed redaction request limited to the final price for its proposal.  All other redactions were requested by defendant in its July 15, 2009 request.  The redactions requested by the parties are denoted by [***].

[2]     The Military Sealift Command ("MSC") is an operating unit of the Department of the Navy ("Navy").  See 10 U.S.C. § 6011; see also 32 C.F.R. § 700.204(c) ("The operating forces of the Navy and the Marine Corps comprise the several fleets, seagoing forces, Fleet Marine Forces, other assigned Marine Corps Forces, the Military Sealift Command and other forces and activities that may be assigned

(continued...)

to serve as a floating military warehouse, deployed to the Pacific Ocean, ready to rapidly respond to military troop needs world-wide as part of MSC's prepositioning program.  (AR 102-227.)[2]  The ship would be "employed in worldwide trade for the transportation and/or prepositioning of cargo (including but not limited to hazardous cargoes, explosives, ammunition, vehicular, containerized and general cargoes) and for military readiness in accordance with the terms of this Charter." (AR 123, 1384.) It was estimated that the ship would be at anchor 80% of the charter period and underway the other 20%.  (AR 124.)

Until recently, MSC's program had three vessels under staggered contracts. That number was recently reduced to two.

## **Background**

Plaintiff, Red River Holdings, LLC ("Red River") is a Delaware limited liability company with its principal place of business in Rockville, Maryland.  Red River, a small business, was awarded a prior contract, and was one of two offerors to

---

[2](...continued)
thereto by the President or the Secretary of the Navy."). MSC is responsible for the acquisition of vessels and other maritime assets for the use and support of the Navy and other military departments. *See* Military Sealift Command, www.msc.navy.mil ("MSC's mission is to support our nation by delivering supplies and conducting specialized missions across the world's oceans.").

*Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 530 (2008).

[3]"A 'charter party' is simply a 'contract … by which an entire ship, or some principal part thereof, is let for the specified purposes of the charterer during a specified term, or for a specified voyage, in consideration of a certain sum of money per month or per ton, or both, or for the whole period or adventure described.'" 22 Richard A. Lord, *Williston on Contracts* §58.5 (May 2009) (citing *The Harvey and Henry*, 86 F. 656 (2[d] Cir. 1898)).  A time charter is for a certain time period. *Sealift, Inc. v. Reilly*, 496 F. Supp. 2d 52, 53 n.1 (D.D.C. 2007) ("A time charter is a service contract in which the contractor is responsible for engaging the crew, [and] maintaining and navigating the ship in accordance with MSC directions.").

[4]  "AR" refers to the Administrative Record of this charter party procurement.  The AR originally filed under seal on April 10, 2009 was corrected by a replacement of AR 102-228 on May 15, 2009.  The AR references in this Opinion are to the corrected pages.

respond to the RFP.  Red River offered to charter the MV Black Eagle ("Black Eagle"), a self-sustaining cellularized container ship previously under charter to MSC as the MV AIC William H. Pitsenbarger from 2001 to 2008.

Sealift, Inc., also a prior contract awardee, proposed the MV TSGT. John A. Chapman ("Chapman").

The RFP, issued on December 5, 2008, was amended several times.  Both Sealift and Red River's proposals were found to be within the competitive range. Following discussions, on February 24, 2009, Red River was informed the contract was awarded to Sealift, as the offeror submitting the lowest-price, technically acceptable proposal.[5]

On March 5, 2009, Red River filed a bid protest at the Government Accountability Office ("GAO") alleging that MSC's evaluation and award were improper because the vessel offered by Sealift could not meet the "cocoon" specifications in the RFP concerning on deck storage facilities with the requisite air-conditioning and dehumidification systems.

On March 18, 2009, prior to production of the Administrative Record, the GAO dismissed the protest, finding "Red River's protest consists solely of its speculation that Sealift will have difficulty performing the contract at its proposed price." (AR 1505.)  Such "speculation does not satisfy the requirements of our Regulations . . . that a protester establish the likelihood that we will find improper agency action." (Id.) Whether Sealift's proposal complied with the RFP's technical requirements was neither presented nor addressed.

On March 26, 2009, Red River filed its Complaint with this court.  After the government filed the AR, on April 15, 2009, Red River filed its First Amended Complaint, and on April 27, 2009, its Motion for Judgment on the Administrative Record.  Defendant's Cross-Motion for Judgment Upon the Administrative Record and Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record was filed on May 20, 2009.  Red River filed a Reply Brief and Opposition to

---

[5]According to counsel, Sealift was advised of the pendency of this litigation.  However, it did not seek to intervene and has not made an appearance.

Defendant's Cross-Motion for Judgment on the Administrative Record on May 26, 2009.  Oral argument was held on May 28, 2009.

This procurement implicates global military readiness and national security.  Immediate commencement of the initial 3.5 month contract period is needed so that the vessel can proceed to Saipan[6] to replace, with some overlap, another vessel that is coming off-charter.  Because of the statutory stay imposed by the GAO protest, Sealift advised MSC that its originally scheduled delivery of its vessel, the Chapman, to the Military Ocean Terminal, Sunny Point, North Carolina between June 8th and June 15th would be delayed to July 15, 2009.  (AR 1510.)

Red River asserts that the award to Sealift was arbitrary and capricious because Sealift's proposal did not comply with all the technical provisions of the RFP and MSC's technical evaluation committee's ("TEC") consensus[7] that it did comply was clearly unsupported and erroneous.  Secondly, Red River contends that MSC relaxed the requirements of the RFP for Sealift without offering the same standard to Red River.

The court concludes that the evaluation of the proposal and award to Sealift was incomplete because it did not include all the requirements of the Solicitation.  The agency evaluators were tasked with gauging compliance based on summary forms with abbreviated requirements and conclusory and unsupported statements of compliance.  The Solicitation also required support and detail as to how the offeror proposed to meet and implement the requirements and capabilities of the Solicitation.  Technical compliance would be determined on that detail which included the vessel's climate control, security and communications and cocoons.

## The Solicitation

The RFP is for a firm-fixed price charter, with reimbursable elements for fuel.  The charter provided a base period of about 3.5 months with four option periods of 1-year each and a final option period of  about 7.5 months.[8]

---

[6]Saipan is the largest island and capital of the United States Commonwealth of the Northern Mariana Islands, a chain of fifteen tropical islands in the Pacific Ocean.

[7]The Technical Evaluation Plan encouraged consensus.  (AR 74.)

[8]The initial 3.5 month period would terminate at the end of the fiscal year.  Accordingly, any
(continued...)

The RFP contains detailed vessel specifications including the ability to store at least 900 TEUs[9] in a secure climate-controlled environment in cocoons – large box-like structures that can be rapidly and easily loaded and unloaded within specified parameters. At least 455 TEUs had to be stowed below deck. The rest could be stowed on deck. Because of the nature of the cargo, the rigors of ocean transportation and possible weather-extremes, temperature and humidity controls are among the identified requirements. The individual cocoons, including those stored on the deck, have to be able to attain and then maintain the requisite temperature and humidity.

Section M of the Solicitation, "Evaluation Factors for Award," provided in Paragraph "M-1 Basis for Award," that any award would be made to the offeror with the lowest-price, technically acceptable proposal.[10]

> Award will be made, if at all, to the responsible offeror whose technically acceptable proposal represents the lowest overall price to the Government, price and price related factors considered. . . . Offerors will be required to submit technical data, detailed vessel specifications and fuel warranties, all of which are standard solicitation requirements for MSC time charters. While the Government intends to award without discussions, pursuant to FAR 52.215-1(f), Instructions to Offerors-Competitive Acquisition (JAN 2004),[11] the Government reserves the

---

[8](...continued)
options would be on a fiscal year basis. Because of congressional restrictions, the total contract period may not exceed five years.

[9]Twenty Foot Equivalent Unit ("TEU") is a cargo container 20 feet long, 8 feet wide and 8 feet tall or the equivalent. Obviously, 900 of these containers requires a large vessel.

[10]Although the Solicitation stated that it was a lowest-price, technically acceptable award, Section L-(f)(1) ("Contract award") provides that the contract will be awarded to the responsible offeror "whose proposal(s) represents **the best value** after evaluation in accordance with the factors and subfactors in the solicitation." (AR 213 (emphasis supplied).) *See also* Paragraph M-12 (stating award would be best value). (AR 226.)

[11]This regulation also incorporates a best value standard.

(f) *Contract award.* (1) The Government intends to award a contract or contracts
(continued...)

right to conduct discussions if the Contracting Officer later determines them to be necessary.

(AR 222 (footnote added).)

Technical requirements are contained in several parts of the Solicitation. While somewhat tedious, a review of these provisions, compared to those used by the TEC, reveals a disconnect.

Paragraph M-3 states: "[i]n order to be determined technically acceptable, and thus be eligible for award, vessel must meet the minimum technical requirements below **and in Section C**." (AR 222 (emphasis supplied).) Paragraph M-3.1.1, "Minimum Requirements" specifies:

> 1. Minimum 900 TEU capacity.
> 2. Approximately 655 TEUs will be loaded as mission cargo, 366 TEUs ammunition laden, 89 TEUs loaded with inert cargo, and 200 empty

---

[11]/(...continued)
resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation.

   (2) The Government may reject any or all proposals if such action is in the Government's interest.

   (3) The Government may waive informalities and minor irregularities in proposals received.

   (4) The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. If the Contracting Officer determines that the number of proposals that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the Contracting Officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.

   (5) The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit cost or prices offered, unless the offeror specifies otherwise in the proposal.

48 C.F.R. § 52.215-1(f) (2008).  Neither party asserts that a best value comparison was or should have been made.

TEUs. The 455 loaded TEUs must be stowed under deck.  The 200 empty TEUs, and any additional cargo TEUs and cargo, may be stowed above deck.

3. Maximum laden draft 35 feet at full load[.]

4. Minimum SOA 16 knots – Fully laden, moderate weather[.]

5.  Minimum range 13,000 nautical miles unrefueled (full cargo load)[.]

6.  Climate Control (Air conditioning/Dehumidification systems installed) in all holds loaded with mission cargo, maintaining at 85 degrees Fahrenheit (or less) and 40-50% relative humidity.  Cocoon system with AC/DH is acceptable to accommodate the minimum number (900) of containers.  Climate control will be provided for all loaded containers (to the minimum 900 TEU capacity) whether loaded with mission cargo, or empty.

7.  Minimum two 30 Long Ton SWL Electric-Hydraulic Cranes and associated lifting gear (Gantry cranes acceptable)[.]

8.  Minimum one 6.5 M Ton SWL Electric Stores Crane, capable of load/discharge port & starboard side[.]

9.  Fully self-sustaining at all hatches loaded with sponsor/mission cargo[.]

10. Berthing for 25 persons (15-person security team and a 10-person management/port operations team)[.]

11.  Have an ISO-9000[12] certification (or similar) at delivery[.]

(AR 222-23 (footnote added).)

Section C, "Description/Specifications Statement of Work," incorporated as part of the technical requirements by Paragraph M-3, includes in Paragraph C-3 the same requirements except the ISO-9000 certification is not included:

C-3 Vessel Specification/Capability.   Each vessel shall meet the following minimum specifications:

1.  Minimum 900 TEU capacity.

2.  Approximately 655 TEUs will be loaded as mission cargo, 366 TEUs ammunition laden, 89 TEUs loaded with inert cargo, and 200 empty

---

[12] ISO 9000 refers to standards for quality management of the International Organization for Standardization.

TEUs. The 455 loaded TEUs must be stowed under deck.  The 200 empty TEUs, and any additional cargo TEUs and other cargo, may be stowed above deck.

2 [sic].  Maximum laden draft 35 feet at full load (mission cargo)[.]

3.  Minimum SOA 16 knots – Fully laden, moderate weather[.]

4.  Minimum range 13,000 nautical miles unrefueled (full cargo load)[.]

5.  Climate Control (Air conditioning/Dehumidification systems installed) in all holds loaded with mission cargo, maintaining at 85 degrees Fahrenheit (or less) and 40-50% relative humidity.  Cocoon system with AC/DH is acceptable to accommodate the minimum number (900) of containers.  Climate control will be provided for all loaded containers (to the minimum 900 TEU capacity) whether loaded with mission cargo, or empty.

6. Minimum two 30 Long Ton SWL Electric-Hydraulic Cranes and associated lifting gear (Gantry cranes acceptable)[.]

7.  Minimum one 6.5 M Ton SWL Electric Stores Crane, capable of load/discharge port & starboard side[.]

8.  Fully self-sustaining at all hatches loaded with sponsor/mission cargo[.]

9.  Berthing for 25 persons (15-person security team and a 10-person management/port operations team)[.]

(AR 124.)

Section C contains additional technical specifications.  Paragraphs C-5.3.20.11 and 12 require cocoons be able to withstand 100 mph winds and associated rolling seas; be constructed in such a manner as to allow for discharging cargo within 6 hours of vessel arrival; and be capable of being dismantled with minimum degradation so they could be reused.  The cocoons must be designed to open by rolling within themselves (accordion style) or from side to side.  They could not require disassembly to unload cargo.  The vessel must be ready to sail no later than 96 hours after the last cargo is loaded.  (AR  133.)  Paragraphs C-9 and 9.1 describe the required communication system.  (AR 138.)

Section L, "Instructions, Conditions and Notices to Offerors," is another source of technical requirements  including what is referred to as the narrative requirement not included in Sealift's proposal.  Paragraph L-7 provides:

(a) The Technical Volumes [of a proposal] shall describe how the vessel meets the requirements and capabilities set forth in this solicitation. The technical data, documentation and supporting rationale shall be complete and specific. The Offeror shall provide an adequate level of detail to demonstrate complete understanding and compliance with each of the requirements and how they will be met. This can be done by drawings, descriptions, and supporting calculations and analysis. The Government will determine if an Offeror's proposal is technically acceptable based on the information submitted. Additional information may be requested if deemed necessary.

(AR 215.)

Section L also requires the submission of Attachment F, the summary form of abbreviated requirements which Sealift did submit.

(b) In addition to the narrative note above, offers must also include the following specific information and sections:

(1) Completed boxes 7-97 in Part B of this solicitation
(2) Two sets of complete general arrangement drawings of the vessel, one paper copy, one on Compact Disc (CD-ROM)
(3) Evidence of International Ship Security Certificate compliance
(4) Evidence of Safety Management Certificate
(5) Manufacturer's fuel consumption warranties
(6) Vessel's/Company's most recent inspections, if any
(7) ISO 9000 or similar certification, as applicable
(8) Maintenance Plan
(9) Any other characteristics/details that are pertinent to the Government's evaluation factors
(10) Attachment E, Ship Characteristics Record for Operations
(11) Attachment F, Technical Summary

(AR 215.)

Shipboard security system requirements are contained in Attachment L.

(c) The Offeror shall comply with the requirements found in:

> (1) Attachment D, Electronic Data Interchange Trading Partner Agreement
> (2) Attachment J, Anti-Terrorism and Force Protection (AT/FP) Requirements
> (3) Attachment K, Specifications for Chemical, Biological, and Radiological Defense (CBR-D) Decontamination Station
> (4) Attachment M [sic - should be Attachment L], Shipboard Security System Requirements

(AR 216.)

Attachment F: Technical Summary (see L-7 (11)) is a matrix summary chart of some but not all of the technical minimums. Attachment F includes a not-to-exceed 85 degree F. temperature/40-50% humidity entry with a check-box space for whether or not the offer complies. (AR 181.) Attachment L, discussed *infra*, with security requirements, is also an entry on Attachment F. (AR 181-93.)

Paragraph L-(4)(f)(3) allows the government to waive informalities and minor irregularities in proposals received. (AR 213.)

## The Technical Evaluation Plan

The Technical Evaluation Plan ("TEP") did not include all of the foregoing. (AR 73-101.) The TEC was tasked with evaluating proposals as follows:

> B.      **Technical** The technical basis for award is the ability of an offeror to meet or exceed the minimum requirements in the following areas. Prior to discussions, if discussions are held, a rating of acceptable, susceptible to being made acceptable, or unacceptable will be assigned for each technical factor. After discussions, if discussions are held, a rating of acceptable or unacceptable will be assigned for each technical factor.
>
>> i) **Minimum Technical Requirements:** All proposed ships will be evaluated to determine technical acceptability based on the minimum technical requirements of this solicitation and conformance to the terms and conditions of the solicitation. Ship acceptability will be evaluated based on pass/fail criteria. In order to be

determined technically acceptable, and thus eligible for award, an offeror's ship must meet (or exceed) the following criteria:

| MINIMUM REQUIREMENT SECTION M, PARAGRAPH M-3.1.1 ITEM # | CATEGORY | MINIMUM | A | S | U |
|---|---|---|---|---|---|
| 1. | Flag & VISA | U.S. Flag & VISA enrolled by delivery | | | |
| 2. | Cargo Capacity | 900 TEUs | | | |
| 3. | Cargo Stow | 455 TEUs loaded with mission cargo stowed completely below deck | | | |
| 4. | Draft | 35' Maximum laden draft at full load | | | |
| 5. | Warranted speed, fully laden, moderate weather | 16 knots | | | |
| 6. | Range | 13,000 NM, unrefueled, full cargo load | | | |
| 7. | Climate Control | For all 900 TEUs 40-50% relative humidity, 85 degrees F or less | | | |
| 8. | Cargo Cranes | Two 30-Long Ton capacity electric-hydraulic (Gantry cranes are acceptable) | | | |
| 9. | Stores Crane | One 6.5 metric ton capacity | | | |
| 10. | Self-sustaining | Fully self-sustaining at all hatches loaded with sponsor/mission cargo | | | |
| 11. | Berthing/Messing in addition to crew | 15 person Security team and 10 person port management operations team | | | |
| 12. | Certification | ISO-9000 or similar at delivery | | | |

(AR 76-77.)

Proposals would be rated as "[a]cceptable, [s]usceptible to being made acceptable or [u]nacceptable." (AR 79.) Completeness was contemplated as other technical ratings include "deficiency" defined as a "'material failure of a proposal to

- 11 -

meet a Government requirement.'" "A deficiency may be an omission of data, that makes it impossible to assess compliance with the evaluation factors/subfactors . ..." (AR 80.) An "omission" is defined as "[**i**]**nformation requested in Section L of the RFP** that was not provided in the proposal." (AR 80 (emphasis supplied).)

This recognition of Section L has relevance as it militates against the government's position that the matters contained therein are informational only. Moreover, the Technical Evaluation Worksheet[13] includes a discussion section entitled "Narrative Evaluation . . . Clarifications/Errors/Omissions/Deficiencies. Include cross-references to the solicitation and proposals." (AR 92.) The eleven categories, each with four blank lines for comments are: (1) cargo capacity; (2) cargo stow; (3) draft; (4) speed; (5) range; (6) climate control; (7) cargo cranes; (8) stores cranes; (9) self-sustaining; (10) berthing/messing in addition to crew; (11) ISO-9000 certification. (AR 92-93.) The TEP also provides that "[t]he KO [Contracting Officer] will use the factors established in the solicitation to make the selection decision." (AR 82.)

Instructions were given to the evaluators that "[p]reconceived ideas or personal knowledge that cannot be substantiated by the evaluators will not be considered." (AR 80.) Also "[t]he evaluation documentation must clearly reflect the rationale with as much quantitative analysis as possible, rather than subjective opinion."[14] (AR 86.)

A second evaluation form was provided to the TEC as follows:

| OFFEROR: | | |
|---|---|---|
| EVALUATOR: | | DATE: |

The following summarizes additional minimum vessel requirements specified in Section C, Attachment F and Attachment L.[15] Evaluators shall use this "checklist" to indicate if the proposed vessel meets or will meet these requirements:

---

[13]"The evaluation worksheet in Appendix I will be used to document the evaluation." (AR 81.) While no Appendix I was included, there is an Attachment C – Technical Evaluation Worksheet. (AR 91-93.)

[14]In contrast, past performance evaluation (by a separate panel) included consideration of "past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement." (AR 225.)

[15] The inclusion of Attachment L has relevance as it also militates against the government's
(continued...)

| Section | Description | Minimum | ✔ |
|---|---|---|---|
| C-5.1.3 | Dry-docking | Conform to USCG regulations for extended tailshaft examination intervals and extended dry-dock intervals.  No required drydocking for credit during charter period, including option periods. | |
| C-5.1.4 | Vessel age | If reflag required, <20 yrs. Substantial rebuild, <25 yrs.  Foreign built, 1 yr documented performance history | |
| C-5.1.5 | Tin-free delivery | Free of tin-based coating | |
| C-5.1.6 | Cargo Hold Fixed Water Spray Cooling System | Meets the requirements of SOLAS II-2/54 | |
| C-5.3.3 | Panama Canal | Vessel capable of transiting | |
| C-5.3.5 | Air draft | <135 ft | |
| C-5.3.8 | Boat fueling | One on-deck fueling station, USCG approved | |
| Attach L | Shipboard Security System | Meets Attachment L requirements | |
| C-5.3.10 | Accommodation ladders | P/S leading aft, fitted with platform | |
| C-5.3.11 | Water production | Produce and store 30 tons per day in tropical waters. PHS approved system. | |
| C-5.3.14.1, C-5.3.14.2, C-5.3.14.3 | Pollution control | USCG approved MSD with a 30 day capability, and a bilge oil-water separator.  Incinerator capable of burning solid waste and waste oil meeting requirements of MARPOL 73/78 | |
| C-5.3.15 | Spare parts storage | Sufficient for six months usage | |
| C-5.3.15.1 | Onboard stores | Dry stores sufficient for two months on station. Capable of storing 90 days dry and 45 days chill/freeze on arrival. | |
| C-5.3.16 | Paint locker | Sufficient paint for two months usage | |
| C-5.3.20 | Environmental monitoring | One sensor per 150 K [cubic ft] of cargo space, minimum of 2 per hold.  Recording system. | |
| C-5.3.21.11 | Cocoon (if installed or proposed) | Designed to withstand 100 MPH wind.  Constructed to allow cargo ops within 6 hrs after arrival. <96 hrs to install after load, accordion style construction. | |
| C-10 | Navigation Equipment | Two radars, GPS, Gyro Compass, Auto Steering Device, Fathometer, Speedlog, Weather FAX | |

(AR 94 (footnote added).)

---

[15]/(...continued)

position that ship security system requisites therein were not technical requirements. As discussed *infra*, Attachment L contains security systems minimums.

In sum, the TEC was tasked with gauging compliance with Paragraph M-3.1.1, several provisions of Section C, Attachment F and Attachment L.[16/]  (AR 91-95.) These two forms were used by the TEC to gauge both offerors' proposals. (AR 1256-79.)  The TEC was also instructed to conduct "independent, impartial, and comprehensive evaluation of all offerors' proposals in accordance with the solicitation and TEP."  (AR 86.)

Attachment F, a one page form, which Sealift did submit as part of its proposal (AR 1146) provides virtually no details, primarily pronouncing that the vessel Sealift would be providing either complied or would comply with those listed minimums. The evaluators' notes indicate that these statements are what were relied upon in determining technical compliance. (AR 1257-58, 1261-62, 1265-66, 1269-70, 1273-74, 1277-78.)  However, there is no narrative or detail in Sealift's proposal to "describe how the vessel meets the requirements and capabilities set forth in this solicitation" and how it "compl[ies] with each of the requirements and how [the requirements] will be met" as required by Paragraph L-7(a).  (AR 215.)

Sealift's proposal does include a profile photograph and drawings/schematics of the vessel. (AR 1045, 1047-48.)  The only  narrative concerning  cocoons was in its cover letter noting that the Chapman[17/] was employed under a previous charter party  completed in August 2007.  The letter references the previous contract and states that a similar cocoon system would be installed on the proposed vessel.  Sealift had to acquire a cocoon system for the vessel it proposed on the subject charter and [***] of Sealift's proposal cost was for new cocoons and air conditioning and dehumidification systems.  (AR 1368, 1390.)  No details are however, provided. Referencing a prior contract, Sealift's letter of January 2, 2009, asserted to satisfy the narrative and detail requirements of Paragraph L-7, states:

---

[16/]Some confusion is engendered in that there is both a  Section L and an Attachment L.  They are different.  (AR 209-21, 192-93.)  Section L, titled "Instructions, Conditions, and Notices to Offerors," includes Paragraph L-7, entitled "Technical Volume Requirements."  (AR 209-21.) Attachment L contains the requirements for the Shipboard Security System. (AR 192-93.)

[17/]Formerly known as the Merlin.

[\*\*\*] [18/] [19/]

[\*\*\*]

(AR 1108, 1129 (footnotes added).)  The photos and sketches must be of the vessel under prior contract as the Chapman had not yet been outfitted for this mission proposed.

The AR also includes schematic diagrams of the Chapman that depict the ship's cranes, a side view, two bird's eye views and four cross-sections, with outlines of apparent cocoon structures, at least according to the government. (AR 1512-14.) Given the placement of these renderings at the very end of the AR rather than with Sealift's proposal raises the possibility they were not included and may have been provided to MSC at some time after the award pursuant to Section C-22.1.[20/]  A large drawing was included in Sealift's proposal titled "Main Particulars Characteristiques Principales," (AR 1208, 1210 (appear to be a part of a larger drawing and a ship profile depiction).)  It appears that some drawings and data were included in Sealift's original proposal.  AR 1208, 1210, 1228-31 of Sealift's proposal are part of AR 1513-14.  Possible relevant data depicted includes volume and area of decks and the number of 20 foot containers that could be stowed (480 TEU above deck and 583 TEU below deck).  (AR 1229.)  The record does not otherwise explain how these drawings met the requirements of detail and support mandated by Section L, when they were provided or their reference or consideration in the evaluation of Sealift's proposal.

The cocoons, the climate and humidity controls and the security and communications systems are not off-the-shelf commodities.  The number, size and complexity of the cocoons and the strict strength, heat and humidity requirements are

---

[18/] [\*\*\*]

[19/] [\*\*\*]

[20/]   Section C-22.1 Ship Drawings Within 48 hours of award the Owner shall provide detailed ship drawings indicating all stowage areas, bulkheads, rooms etc., suitable for the preparation of stow plans. These drawings shall include unusual obstructions or characteristics not readily discernable from deck drawings.

(AR 141.)

matters that under the terms of the Solicitation required attention.  These are not immaterial matters in an ocean-going vessel going through 100 mph winds, loaded with tons of ammunition and supplies for possible deployment.  Given the importance of the ammunition and related military equipment and supplies, prepositioned in the ocean at a distance from the United States, the Solicitation indicates that details and supporting documentation were expected.

In contrast to Sealift's lack of detail, description or narrative support, eight pages of Red River's proposal describes the "cargo controlled environment information," including the advanced air conditioning desiccant[21] dehumidification equipment which can maintain the required humidity levels when the ambient air temperature is below 55 degrees Fahrenheit which allegedly is not achieved by most systems.  (AR 356.)   The air conditioning tonnage calculations and industry guidelines used to calculate them are also specified.  (AR 358.)  Temperature and humidity is measured every five minutes and averages recorded every thirty.  (*Id.*)  The cocoon system (apparently in place) was also described, starting with Red River's history with Rubb Building Designs (designer of cocoon systems on three other vessels, including the MV Capt. Steven Bennett (AR 358)), and adoption of lessons learned in that experience, including an increase in roof pitch to increase rain water drainage and additional insulation (to an R value of 11) which were incorporated into the proposed cocoon system.  Ease of access and wind resistence were both addressed, also in narrative form.

[***]

[***]

(AR 358.) Two pages of technical drawings of the Rubb cocoon system are included, including various elevations and other details that are not readily apparent to the court, along with four photographs of the loading or unloading of the cocoons.  (AR 360-62.)

In addition to supportive narrative data, Red River's proposal includes a completed Attachment F. (AR 431-32, 440-41.)

---

[21]A material, such as calcium oxide, that absorbs moisture.

### Review of Sealift's proposal

Technical evaluation of Sealift's proposal was on the two summary forms, *infra*. Evaluators checked boxes as to acceptability in the categories presented. At the end of each form were several lines for comment for each of the enumerated entries. (AR 1256-79.) Section M, paragraph 3.1.1, Item 3, requiring 455 TEUs stowed below deck, is not listed in Sealift's Attachment F. While Red River addressed the split between storage on deck and below deck in its narrative, which was reflected in evaluators notes, Sealift apparently did not. (AR 1256-57.) Sealift's proposal (AR 1134) listed [***] TEU under deck and [***] TEU on deck, for a total of [***] which met the minimum. (AR 1257.) This produced a consensus to question whether 455 TEUs of mission cargo could be stored under deck because of segregation concerns. (AR 1257.)

Evaluators' individual and consensus notes report "per Attachment F-complies" several times, including for climate control, cargo cranes, store cranes, self-sustaining, berthing/messing – five of the eleven technical categories of minimum requirements. (AR 1257-58.) One evaluator was apparently concerned about the several "will comply" answers, noting that the comments assumed that the vessel did not then comply. Comments of "no explanation of 'will comply'" were written as to three categories of minimum requirements, Attachment L (Shipboard Security), C-5.3.20 - environmental monitoring and C-5.3.21.11 - Cocoons. (AR 1271.) These hand written comments were crossed-out. (AR 1271.)

In addition to the lack of narrative support, Sealift's proposal did not contain data about the vessel's security system, communications equipment, key personnel, recent inspections or maintenance plans.

Attachment L, AR 192-93, includes requirements for a Shipboard Security System including specific criteria for hull perimeter lighting, closed circuit television, intrusion detection and audible warnings, each with specific technical standards. Sealift did not provide any details, yet the evaluators uniformly accepted that Sealift "would comply" based only on Sealift's Attachment F.

The government argues that shipboard security is not a minimum technical requirement because it is not mentioned in Section M-3.1.1 or in Section C. (Dkt. 35 at 24-25.) The government strains credulity in suggesting failure to comply with security on a vessel filled with ammunition and other military supplies, afloat in the

Pacific Ocean or at various ports, is not material.  The TEP evaluation form included Attachment L, Shipboard Security System, as a minimum requirement.  (AR 94 ("The following summarizes **additional minimum vessel requirements specified in** Section C, Attachment F and **Attachment L**.")(emphasis added).)  The entry for "Attachment L, Shipboard Security System" with "minimum" summarized as "meets Attachment L requirements" puts this issue to rest.

In addition to its specific inclusion in the technical evaluator's worksheet, security system requirements of Attachment L (mistakenly referred to as Attachment M) is included in the RFP, in Paragraph L-7(c)(4).  (AR 216.)  Details in the RFP for this floating ammunition depot include lights, closed circuit TV, intrusion detection system, audible warning system and video feed recording equipment capable of storing 24 hours of recording.  Also required is hull perimeter lighting ("HPL") with:

> sufficient fixed or portable hull waterline lighting such that, pierside or at anchor, the entire hull is lit at the waterline.  There are to be no dark areas.  The lighting shall provide, at minimum, light of 5 foot-candles, measured from the hull's waterline horizontally outwards to a 30 foot distance.

> The HPL shall be capable of being turned on either entirely, lighting the entire hull waterline, or separately, lighting either the port or starboard hull waterline.

(AR 192.)

Interior closed circuit television systems must include cameras to monitor the main engine space, master's cabin, small arms lockers, and radio room with the capability of being monitored from the gangway in port and from the bridge while at sea.  (AR 192-93.)  Motion detectors are required as well as "two portable audible warning systems capable of producing at least 85 DB at 500 yards from the ship.  The system shall be capable of playing recorded messages via a removable CD, have a microphone for loud hailing and a warning burst." (AR 193.)

Red River's proposed security system included an HPL, an intrusion detection system, closed circuit television and audible warning system with four pages of details.  (AR 268-72.)  Discussion matters presented to Red River include whether the

HPL would be bright enough – 5 foot candles at 30 feet for the entire perimeter – and whether the security system could store twenty-four hours of video, as specified in the Solicitation. (AR 1284.) Red River points out that while it was questioned about its security system, that had been detailed in its proposal, Sealift's "will comply" on Attachment F was accepted as meeting requirements. The government responds that scrutiny of Red River's detailed proposal was prompted by its "as proposed" on the form, a response suggesting variance from the specifications, but no record support is cited for the lack of scrutiny on the undescribed "will comply" system proposed by Sealift.

The government's position that Attachment L does not contain technical requirements is rejected.

Sealift's proposal also failed to address, and MSC did not evaluate, communications systems requirements in Section C-9 and C-9.1.

> <u>C-9 Communication Equipment</u> The contractor shall ensure that the Vessel configuration and equipment meets the Regulatory Body Distress/Ship requirements of the U.S Coast Guard (USCG), Federal Communications Commission (FCC), International Maritime Organization (IMO); and International Convention for the Safety of Life at Sea (SOLAS), 1974, as amended.

(AR 138.)

Section C-9.1 requires: (1) space for both contractor and MSC-supplied communication equipment; (2) an INMARSAT[22] station; (3) MF/HF transceivers; (4) accommodations for government-supplied secure communications equipment; (5) capability to transmit and receive Department of Defense General Service (GENSER) messages; (6) radiotelephony over terrestrial and satellite circuits in VHF, HF, MF bands as described in COMSCINST 2000.2 (Series); (7) support for encrypted communication equipment, in compliance with various Department of Defense and Department of the Navy guidance and including physical security requirements in several government manuals and publications; (8) office furniture, telephone, facsimile machine, a General Services Administration-approved safe that met certain

---

[22]INMARSAT is an international telecommunications company.

standards, a cross-cut type shredder with a maximum size residue of 3/64 inches wide by 1/2 inch long; (9) office equipment to maintain communications logs and safes to file classified and unclassified messages for at least thirty days; and (10) a designated and trained crewmember to operate the INMARSAT equipment if the vessel is placed in a reduced operational status.  (AR 138-39.)

Other than the general comment that minimum technical requirements are limited to those in Sections M-3.1.1 and C-3, the government does not specifically respond to these omissions.

Evaluation of proposals included both technical and past performance.  Past performance was evaluated by a different panel of evaluators.  Paragraph M-5 provides that offerors "shall" submit at least two Past Performance Questionnaires, Attachment O to the Solicitation.  The questionnaire asked for input on quality of products, services and customer satisfaction in prior similar contracts.  Staff, key personnel and subcontractors were included.

Past Performance, paragraph M-5.1(5) provides:

> The Offeror shall submit a list of key personnel who will be actively involved in the operation and management of this vessel.  The Offeror shall list the job title, description of responsibilities (engineering, operations, etc.), length of tenure with the company and any other significant data of these key personnel.

(AR 225.)

In short, personnel requirements are part of the Solicitation's past performance section and are not part of technical acceptability.

The government accurately points out that certain data did not have to be included with the proposal but could be provided later, prior to the delivery of the vessel.  The crew list with certain identifying data would have to be provided within 30 days before the delivery of the vessel.[23/]  (AR 126.)

---

[23/] Drawings depicting cargo environmental control zones and calculations used to determine
(continued...)

It is questionable whether Sealift's proposal included vessel maintenance plans required by Section L-7(b)(8).

The government contends that Sealift's proposal provides [***] valid certifications of compliance and a [***] letter from its International Safety Management ("ISM") Quality Manager describing its maintenance plans.

Sealift's proposal contains a two-page narrative letter from John Belle, Sealift's ISM Manager. Mr. Belle wrote that Sealift had "[***]." (AR 1144-45.) Sealift further indicated that its "[***]," a renewal of the original quality certification it received in May 1998. (*Id.*) Its "[***]." (*Id.*) It had "[***]." (*Id.*)

General description and praise for a maintenance plan does not substitute for a description of its specific provisions which are not contained in the AR.

An issue is also raised whether the proposals required submission of inspection records. Sealift did not provide a recent inspection report as required by Section L-7(b)(6). The government contends that Section L-7(b)(6) is not a minimum requirement but merely states that offerors shall submit "Vessel's/Company's most recent inspections, if any." (AR 215.) Use of the qualifier "if any," assumed that an offeror may not be in possession of inspection reports. If a report exists, however, it must be submitted.

**Evaluation and discussions**

In addition to technical and past performance, price was also a factor, and prior to discussions, Red River had the lower price.

The TEC consensus on January 9, 2009 was that Red River's proposal was acceptable in all but 2 of the 12 minimum requirements of Paragraph M-3.1.1 summarized on the form presented to the committee, and for the other two, the rating was susceptible of being made acceptable. (AR 1232-33.) The TEC consensus was

---

[23]/(...continued)
the size and quantity of the air conditioning/dehumidification equipment needed to meet the minimum contractual requirements had to be submitted to MSC no later than 60 days after contract award. (AR 132-33.)

that Sealift's proposal was acceptable in 11 of the 12 categories and for the one category not rated acceptable (cargo stow - 455 TEUs mission cargo stowed completely below deck), the consensus was that it was susceptible of being made acceptable. (AR 1256.)

On January 12, 2009, the TEC finalized its consideration of the initial proposals submitted by Red River and Sealift. (AR 1280-81.)  Both offers were assigned an overall technical rating of "[***]" and past performance ratings were "[***]." (AR 1281, 1285.)

The TEC's memorandum to the Contracting Officer ("CO") reports that review was pursuant to the TEP.  (AR 1372-73.)

MSC's Contract Review Board examined both offers and the recommendations of the TEC, together with price and past performance evaluations,[24] and recommended that discussions be held with both offerors and that both offerors be allowed to present final proposal revisions.[25] (AR 1351, 1358-59.)

Discussions commenced on January 21, 2009, and closed at 5:00 pm on January 26, 2009. (AR 1359, 1420-23.)  Both offerors submitted final proposal revisions. (AR 1291-1316, 1317-31.)

The TEC evaluated the final proposal revisions against the "established minimum standards of acceptability" found in Section M – the only Section mentioned – and determined that both proposals, as revised, were "acceptable." (AR 1360, 1372-1373, 1385.)

_____

[24]Both offerors provided past performance evaluations that addressed their performance on other MSC contracts. (AR 1403-16.) [***], one of the members of the TEC, completed a questionnaire about Red River in his capacity as the contracting officer's representative on two MSC contracts held by Red River between 2001 and 2008.  He rated Red River's past performance as [***] and  he "would unhesitatingly contract for this ship in the future." (AR 1404-05.) [***], MSC's cargo project officer, provided a past performance questionnaire for Sealift, noting that Sealift has contracted with MSC "[***]" and that Sealift was "[***]." [***] rated Sealift's past performance as "[***]." (AR 1412-13.)

[25]Red River was given nine technical questions.  (AR 1418, 1420-21.)  Sealift was given four.  (AR 1425, 1427-28.)

The lowest price was defined as "the sum of the total dollar amounts for Daily Hire and fuel for the firm and option time periods and any delivery/redelivery costs or other fees if offered." (AR 223.)  Using this formula, the CO calculated the total final prices to be [***] for Sealift and [***] for Red River. (AR 1367, 1382-83.)  The independent government estimate was [***]. (AR 1367.)

At bottom, the CO concluded that "[t]he offer from Sealift, Inc. represents the lowest total overall price to the Government." (AR 1368.)  "The technical proposal submitted by Sealift, Inc. was determined to be technically acceptable, past performance was determined to be satisfactory and this Contractor proposed the lowest evaluated price which has been determined to be fair and reasonable."  The CO made award to Sealift "for an estimated 1,796-day price of $46,197,020.00." (AR 1393.)

On February 23, 2009, the CO informed Sealift that it was the successful offeror. (AR 1479-80.)  On February 24, 2009, the CO wrote Red River that the contract had been awarded to Sealift. (AR 1481-82.)

## Discussion

### Jurisdiction

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), (b) 110 Stat. 3870, confers bid protest jurisdiction on the United States Court of Federal Claims. Jurisdiction extends to actions by an "interested party" objecting to: (1) a solicitation by a federal agency for bids or proposals for a proposed contract; (2) a proposed award or the award of a contract; or (3) any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement.   28 U.S.C. § 1491(b)(1).  *See Galen Medical Assocs., Inc. v. United States,* 369 F.3d 1324, 1328 (Fed. Cir. 2004); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  In such actions the court may "award any relief that the court considers proper, including declaratory and injunctive relief."  28 U.S.C. § 1491(b)(2).

### Standards of Review

The standards of review of ADRA are those of the Administrative Procedure Act, 5 U.S.C. § 706 (2006) ("APA"); 28 U.S.C. § 1491(b)(4); *Banknote Corp*., 365 F.3d at 1350.  Inquiry is limited to whether the agency action was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 1350-51 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58). *See also PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (construing ADRA as applying APA review standards to bid protests, but not altering court's discretion to fashion injunctive relief). "'[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved  a violation of regulation or procedure.'" *Axiom Res. Mgmt., Inc. v. United States*, 564  F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

The court may not substitute its judgment for that of agency experts.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings … involve discretionary determinations of procurement officials that a court will not second guess.") (citation omitted).  *See also Grumman Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994).

The parties filed cross-motions for judgment on the administrative record under RCFC 52.1 which authorizes the court to conduct an expedited trial on the administrative record, including, if necessary, resolution of factual disputes. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

### **Failure to comply with Solicitation technical requirements**

Red River claims that Sealift's proposal did not comply with all the technical requirements of the Solicitation.  As a result, it is asserted, the agency's award was arbitrary and capricious.  Red River also argues that by not requiring full compliance with the technical requirements, the agency improperly relaxed the requirements for Sealift, without affording the same to Red River, thereby violating the Competition in Contracting Act, 10 U.S.C. § 2305(a)(1)(A) (2000) ("CICA").

The government argues that the minimum technical requirements involved are contained only in Section C-3 and M-3.1.1, and Sealift's proposal covered all the required matters.  The government further argues that if any requirements were not covered, the voids were filled by extrapolation or interpretation of photographs and drawings submitted, and/or by knowledge of what Sealift had done successfully in the past.  "MSC determined that Sealift's proposal provided an adequate level of

detail by use of diagrams, photographs, narrative descriptions, and written and verbal responses to discussion questions." (Dkt. 35 at 14.) Specifically, the government in its brief points to:

> schematic diagrams showing the cocoon system that was previously offered and built on the Chapman. AR 1512-1514. Contrary to Red River's assertions, these schematic diagrams illustrate what Sealift proposed to provide, i.e., a system of the cocoons that MSC has previously accepted as satisfying the requirements of a contract that Red River admits are identical to the cocoon requirements of the present solicitation. The schematic diagrams show the cocoon structures on both sides and on each of the four cross-sections of the vessel. *Id.* These diagrams, in conjunction with the photographs, narrative description, and inclusion of Attachment F in Sealift's proposal enabled MSC to reasonably conclude that Sealift's proposal provided an "adequate level of detail" as called for in Section L-7(a) and, therefore, it was equally reasonable for MSC to determine that Sealift fully satisfied the minimum technical requirements of the solicitation.

(Dkt. 35 at 22.) Finally, the government insists that any omission was minor and waivable at the agency's discretion.

The Solicitation required more than Sealift submitted and the failure of the agency staff to present the TEC with all the evaluation criteria was arbitrary and capricious and in violation of procurement standards.

The Solicitation cautioned that the "Technical Volumes shall describe how the vessel meets the requirements and capabilities. . . . [T]he [specific and complete] technical data, documentation and supporting rationale" shall "demonstrate complete understanding and compliance with each of the requirements and how they will be met . . . . The Government will determine if an Offeror's proposal is technically acceptable based on the information submitted." (AR 215.) This language put potential bidders on notice that description of "how the technical requirements would be met" was material and that technical compliance would be measured by that support and warns that technical acceptability will be determined by the narrative of how the vessel meets or will meet the requirements, not simply that it will. *Banknote*

*Corp. of Am. v. United States*, 56 Fed. Cl. 377, 382 (2003) (discussing language of serious consequences for failure to comply).

As the court in *Ashbritt, Inc. v. United States* explained in enjoining an agency award for failure to follow the terms of the Solicitation:

> It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation. FAR § 15.305(a) provides that, "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." *See also Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004) ("The agency's failure to follow its own selection process embodied in the Solicitation is . . . a prejudicial violation of a procurement procedure established for the benefit of offerors."); *Banknote*, 56 Fed. Cl. at 386 ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."); *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 194 (1999) (citations omitted) ("[A] contract award may not be upheld when the [source selection authority] improperly departs from [the] stated evaluation criteria in a solicitation.").

No. 08-473C, 2009 WL 1872153, at *27 (Fed. Cl. June 25, 2009).

The court in *L-3 Communications Eotech, Inc. v. United States*, 83 Fed. Cl. 643, 653 (2008) similarly explained:

> Technical evaluations should be consistent with the factors, subfactors and procedures outlined in the solicitation. *See* FAR 15.305(a), 48 C.F.R. § 15.305(a) (2007) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *see also Dubinsky v. United States*, 43 Fed. Cl. 243, 267 n.56 (1999) (noting that FAR 15.305(a) "does not grant contracting officers carte blanche to notify offerors of one rating system in the RFP and to then apply a different system during the evaluation of proposals") (citations omitted); *Kilgore Corp.*, B-253672, B-253685, B-253686, 93-2 CPD ¶ 220 (Comp. Gen.

Oct. 13, 1993) ("While procuring agencies have broad discretion in determining the evaluation plan they will use, they do not have the discretion to announce in the solicitation that one plan will be used and then follow another in the actual evaluation.") (citation omitted); *Arltec Hotel Group*, B-213788, 84-1 CPD ¶ 381, 1984 WL 44060 (Comp. Gen. Apr. 4, 1984) ("Consequently, it is improper for an agency to depart in any material way from the evaluation plan described in the solicitation without informing the offerors and giving them an opportunity to structure their proposals with the new evaluation scheme in mind.") (citation omitted). When the evaluation of proposals materially deviates from the evaluation scheme described in the solicitation, the agency's failure to follow the described plan may constitute evidence of arbitrary and capricious decision-making. *See Dubinsky*, 43 Fed. Cl. at 267 n.56 (noting that "[s]uch action is arbitrary and capricious and provides grounds for granting a protest if it prejudices unsuccessful offerors"). Minor irregularities alone, however, will not invalidate a procurement that is reasonable and otherwise not contrary to law. *See Grumman Data [Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996)] ("'De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are.'" (*quoting Andersen Consulting [v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)).[26/]

Proposals must be complete and conform to the Solicitation. *See Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 6 (2004) ("[I]t is well established that all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals.") (citation omitted). In *Software Engineering Services, Inc. v. United States*, 85 Fed. Cl. 547 (2009), the court found the Air Force acted reasonably in

---

[26/] In *Orion International Technologies, Inc. v. United States*, 66 Fed. Cl. 569 (2005) the protestor argued the awardee did not include the proposed permanent project manager in oral presentations. Even if the presence of an acting project manager did not fulfill the solicitation requirements, any possible defect was a "minor informality," 66 Fed. Cl. at 577, distinguishable from "facial noncompliance of mandatory provisions. *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999); *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 138-39 (1999); *Isometrics, Inc. v. United States*, 5 Cl. Ct. 420, 424 & n.9 (1984) (failure to meet specification)." 66 Fed. Cl. at 578 n.9.

concluding the protestor's submittal was incomplete.  Its incumbent status was no substitute for submitting its ability to perform the Solicitation tasks.

> The Air Force, however, acted reasonably in finding SES's incumbent status an insufficient substitute for demonstrating its ability to perform the three mission areas in its proposal. "[I]t is well established that all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals." *Int'l Res. Recovery*, 60 Fed. Cl. at 6 (agency rejection of incumbent proposal was reasonable when incumbent failed to submit a mobilization plan in accordance with RFP, claiming it already was mobilized as the incumbent) (citation omitted); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 209-10 (2004) (record supported lowered rating for technical subfactor based on the incumbent's "less-than-thorough proposal"), *aff'd* 389 F.3d 1219 (2004). Offerors are charged with preparing an adequately written proposal. *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 296 (2007) (citation omitted).

> Thus, SES was required to demonstrate its capabilities within the proposal, and could not rely upon its incumbent contract performance as a substitute for information omitted from its proposal.  *See Int'l Res. Recovery*, 60 Fed. Cl. at 6; *PGBA, LLC*, 60 Fed. Cl. at 209-10.  SES was charged with adequately drafting its proposal to ensure compliance with the RFP.

85 Fed. Cl. at 555-56.

As a corollary of the principle that proposals must meet the requirements of a solicitation, blanket statements that an offeror will meet or exceed them have been found to be noncompliant.  *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 49 n.9 (2005) ("Agency decisions rejecting blanket statements to the effect that an offeror will meet or exceed certain contract requirements or specifications have been upheld in a variety of settings.").

To justify its selection of Sealift, the government cites the Declaration of Ms. Juanita Broennimann, the TEC chairperson, attached to a March 6, 2009 Motion for Summary Dismissal of the GAO protest. (AR 1494-98.)   The Broennimann

Declaration explains why the TEC determined that Sealift's proposal met the minimum technical requirements. "[I]t was clear that Sealift understood the requirements of the solicitation and provided information that it was capable of meeting said requirements. The team had no reason to question the validity of Sealift's statements." (AR 1497.) The TEC relied upon Sealift having previously had a cocoon on one of its vessels, the Bennett, offered for similar purposes and its history of providing similar vessels to MSC with accordion style cocoons. (*Id.*) The March 6, 2009[27] Declaration concluded that evaluators "had evidence" that supported their belief in Sealift's compliance, *to wit*: (1) its cover letter that said "it previously had a cocoon on the vessel offered for similar purposes as those required under the subject solicitation" and "anticipated constructing a similar system" under the proposal; and (2) it had provided similar vessels to MSC with accordion style cocoons. (AR 1497.)  Knowledge of field representative George Pearson, "who has been involved  with the loading of all Air Force ammunition ships, [that] TSGT JOHN A. CHAPMAN had an accordion style cocoon when the vessel was under the previous charter" was also cited.  (*Id.*)

The government has not pointed to these observations elsewhere in the AR and Mr. Pearson was not on the evaluation team.  (AR 84 (TEC consisted of Juanita Broennimann (Chair), Timothy McLaughlin and James Hicks (both Marine Transportation Specialists), together with another "TBN" [to be named?] as evaluators and Elizabeth Bogart (Intern and Observer).  The final evaluator was Lt. Col. Stephen Williams.  (AR 1252-55, 1276-81, 1341, 1372-73.)

Whether or not the evaluation team had any reason to doubt that Sealift could or would comply with what they understood to be the technical requirements is not the correct inquiry.  Rather, the correct inquiry is whether the AR contains requisite support for a determination that Sealift's proposal complied with all technical requirements of the Solicitation.  The government has not pointed to support in the pre-award AR.  *See Axiom Resource Mgmt.*,564 F.3d at 1381 (holding review is limited to agency record unless insufficient to "permit meaningful review consistent with the APA").[28]  Furthermore, any consideration of Sealift's performance in other

---

[27]The award was made on February 23, 2009. (AR 1479.)

[28]RCFC Appendix C, ¶ 22(u) provides that declarations filed in a prior GAO protest are part of the AR.  *See Datapath, Inc. v. United States*, 87 Fed. Cl. 162, __ (2009) (citing RCFC Appendix
(continued...)

contracts would have run counter to the TEP which prohibited undocumented personal opinion.

For the foregoing reasons, the court concludes, on the record evidence, that Sealift's proposal was not evaluated on, and did not conform to, all the material technical requirements of the Solicitation and any determination to the contrary is arbitrary and capricious.

Sealift's proposal did not detail how its vessel's climate and humidity control system was going to meet the temperature and humidity specifications, did not describe the components of its security and communications systems, its maintenance plans or the cocoons, and how any of these met the RFP.

Turning to the second ground, it is asserted the relaxation of the RFP specifications violated the Competition in Contracting Act.

The CICA, 10 U.S.C. § 2305(a)(1)(A) (2000), requires solicitations for competitive proposals to include "all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating . . . competitive proposals . . . and the relative importance assigned to those factors and

---

[28]/(...continued)
C, ¶ 22(u) ("The core documents relevant to a bid protest may include: 'the record of *any previous administrative* or judicial *proceedings relating to the procurement, including the record of any other protest of the procurement*.'") and *Holloway & Co. v. United States*, No. 09-73C, 2009 WL 1351413, at *9 (May 14, 2009) ("'RCFC Appendix C, ¶ 22(u) consequently serves the salutary purpose of ensuring that the full record of all proceedings related to the procurement is before the court for review[.]'")). More recently, in *Rhinocorps Ltd. v. United States*, No. 08-410C, 2009 WL 1588684, at *10 (June 4, 2009) the court disagreed and described this provision of the Appendix as raising more questions than answers, adding that consideration of additional evidence is necessary if the agency action is not adequately explained; if the agency failed to consider relevant factors or considered evidence not in the record; if conflicts of interest are asserted; and when national security concerns impact possible injunctive relief. Also, "[m]aterials generated in an administrative protest always can be cited in a judicial proceeding as admissions or inconsistent positions, but they do not 'supplement' the administrative record." 2009 WL 1588684, at *20 n.18. *See Academy Facilities Mgmt. v. United States*, No. 98-302C, 2009 WL 1808445, at *12-13 (June 5, 2009) (admitting affidavit of the Source Selection Authority which was part of the bid protest at the GAO to avoid speculation and to foster accuracy); *Ashbritt, Inc. v. United States*, No. 08-473C, 2009 WL 1872153, at *18 (June 15, 2009) (supplementation to correct mistake).

subfactors." 10 U.S.C. § 2305(a)(2)(A)(I) (2000); see also, FAR 15.304(d). Agencies "shall evaluate . . . competitive proposals . . . based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1); 41 U.S.C. § 253b(a) (1994); *see also Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386-87 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *Dubinsky v. United States*, 43 Fed. Cl. 243, 266 (1999); *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 44 (1997); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

Any relaxation of the terms of the Solicitation must be extended to all.

(a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the [CO] shall amend the solicitation.

. . .

(d) If a proposal of interest to the Government involves a departure from the stated requirements, the [CO] shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution  proposed or any other information that is entitled to protection.

48 C.F.R. § 15.206(a) & (d) (parenthetical reference omitted).

Red River cites *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999) in support of its alternative position that the result of MSC's truncated technical review was a relaxation of the Solicitation standards for Sealift, which was not extended to Red River.  In *Alfa Laval*, the awardee's proposal to supply oil purifiers did not meet the exact testing standards of the Solicitation, but a "'colossal price difference'" was proposed which apparently sweetened the offer. Like here, the Solicitation was for a lowest cost, technically acceptable proposal. Noting that the awardee's proposal did not meet all the technical requirements, the Federal Circuit applied the ruling in *Data General Corp. v. United States*, 78 F.3d 1556 (Fed. Cir. 1996) and reversed the trial court's conclusion that the protestor –

Alfa Laval – the only other offeror – was not prejudiced because of the huge price difference.

> As the trial court held, "regardless of the [technical review] panel's view of the appropriateness of the standard [set out in the RFP], the Navy is strictly bound by its terms," and in waiving a portion of the standard for [the awardee], the Navy violated a clearly applicable procurement statute and regulation, 40 Fed. Cl. at 230; *see also* 10 U.S.C. § 2305(b)(1) (1994) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. § 15.606(a), (c) (1996) (requiring the government to issue a written amendment to a solicitation when it "changes, relaxes, increases, or otherwise modifies its requirements," and to provide an opportunity for competitors to submit new or amended proposals when it prefers a proposal involving "a departure from the stated requirements").

175 F.3d at 1367-68.

For reasons that are not readily apparent, the proposals were evaluated under criteria of an evaluation plan that did not encompass all the requirements of the Solicitation.  The award to Sealift was based on relaxed standards not extended to Red River, in violation of the CICA.

Red River prevailing under either or both asserted theories, however, does not end the court's inquiry.

## **Standing and prejudice**

Finding agency error does not sustain a protest.  Standing is an element of this court's bid protest jurisdiction. *See Rex Serv. Corp. v. United States*, 488 F.3d 1305, 1307-08 (Fed. Cir. 2006) (affirming dismissal for lack of subject matter jurisdiction because plaintiff was not an actual bidder and could not show prejudice – that it had a substantial chance of the award but for the error alleged).  "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  To demonstrate prejudice, "the protester must show 'that there was

a substantial chance it would have received the contract award but for that error.'"
*Alfa Laval Separation*, 175 F.3d at 1367 (*quoting Statistica, Inc. v. Christopher*, 102
F.3d 1577, 1582 (Fed. Cir. 1996)); *see Galen Med. Assocs.*, 369 F.3d at 1330
(clarifying that, in addition to significant error in procurement process, plaintiff must
show that error was prejudicial) (citing *Data Gen. Corp.*, 78 F.3d at 1562); *Emery
Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001); *Info.
Tech. & App. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[T]he question
of prejudice goes directly to the question of standing . . . [and] 'prejudice (or injury)
is a necessary element of standing.'") (*quoting Myers*, 275 F.3d at 1370)).  *See also
Rhinocorps, Ltd. v. United States*, No. 08-410C, 2009 WL 1588684, at *9, n.12 (June
4, 2009) (analyzing these issues).

The government asserts Red River lacks standing or is unable to establish
prejudice because its proposal was lacking in several instances.  As Red River aptly
points out, however, the consequences of the government's position would mean that
an agency that improperly evaluates all proposals would be insulated from any
review, a result recently rejected.  *See Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460
(2008) ("The Government originally made the senseless jurisdictional argument that
an agency arbitrarily can declare a protested proposal to be nonconforming, while
accepting the awardee's allegedly nonconforming proposal, and thereby preclude the
protestor from standing to challenge the award.").

Red River insists that it is an interested party – "'an actual or prospective
bidder or offeror whose direct economic interest would be affected by the award of
the contract or by failure to award the contract.'" (Dkt. 37 at 2, citing 31 U.S.C. §
3551(2)(A) and *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir.
2006).)

Given the nature of the asserted areas of non-compliance by Red River, as
discussed below, it is concluded that Red River has standing to protest the award to
Sealift.

The government asserts that Red River's proposal was not technically
compliant because it did not provide names of its key personnel, and did not include
Attachments D, J and K as assertedly required by Section L-7.

The government claims Red River failed to submit information regarding key personnel as required by Past Performance Section M-5.1(5).  Red River, a small business, supplied the names and experience of its key personnel and  generally described the duties and responsibilities of the vessel's key personnel involved in the operation and management of the Black Eagle, specifically John H. Morris, III, President, responsible for the general management of the company; Timothy P. Tarrant, manager of engineering, ISM/ISO certification, safety and security; and George Crighton, manager of commercial cargoes, additionally Red River "will continue its present policy of selecting engineering, operations, and administrative staff based on previous Maritime and/or Government experience to achieve the most effective ship management organization." (AR 641, 815.)  Crew lists were to be provided later.

It is concluded that neither Red River's proposal nor Sealift's was deficient in this regard.

Section L-7 requires submission of Attachments D, J and K.

(c) The Offeror shall comply with the requirements found in:
   (1) Attachment D, Electronic Data Interchange Trading Partner Agreement
   (2) Attachment J, Anti-Terrorism and Force Protection (AT/FP) Requirements
   (3) Attachment K, Specifications for Chemical, Biological, and Radiological Defense (CBR-D) Decontamination Station
   (4) Attachment M [sic should be L] Shipboard Security System Requirements

(AR 216.)

Attachment D is an agreement regarding electronic data interchange that is entered into by MSC and the contractor **after** award.  (AR 173-78.)  Attachment J, AR 184-88, relates to Anti-Terrorism/Force Protection and was addressed in Red River's proposal at AR 267, 271-72.  The government withdrew its objection that Red River did not address the Chemical, Biological and Radiological Defense Decontamination Station in the narrative section of its proposal.  The "CBRD Station" is described in Red River's proposal at AR 252.

Accordingly, the government's position that Red River's proposal was lacking attachments does not have record support and is rejected. The court concludes that Red River was "'significantly prejudiced'" by the procurement errors leading to the award to Sealift and established "'there was a "substantial chance" it would have received the contract award but for the errors,'" the applicable prejudice standard according to the government. (Dkt. 35 at 17 (citing *Bannum, Inc.*, 404 F.3d at 1354).)

## **Remedy**

Red River requests the court order the cancellation of the contract award. However, the government correctly points out that if the court determines the award to Sealift was arbitrary, capricious or in violation of law, Red River does not automatically become the contract awardee. (Dkt. 35 at 19-20 (citing *Innovative Resources v. United States*, 63 Fed. Cl. 287, 290 n.5 (2004).)

> In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA*, 389 F.3d at 1228-29.[29/]

Red River alleges the loss of the opportunity for its proposal to be evaluated on a level playing field and within the parameters of the Solicitation has caused it irreparable harm. "'[A] lost opportunity to compete in a fair competitive bidding process for a contract . . . has been found sufficient to prove irreparable harm.'" *Akal Sec., Inc. v. United States*, No. 09-326C, 2009 WL 1653487, at *6 (Fed. Cl. June 10, 2009) (citing *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)). "In addition, the failure of an offeror to have its proposal 'fairly and lawfully considered constitutes irreparable injury.'" *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66,

---

[29/]The government suggests that if injunctive relief were warranted, the appropriate remedy would be to reopen discussions with both Red River and Sealift and "allow them to conform their proposals to satisfy the solicitation's submission requirements." (Dkt. 35 at 20.) Whether or not price would be included in any reopened discussions is not addressed.

78 (2007) (citing *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) (citing *Overstreet Elec. v. United States*, 47 Fed. Cl. at 744 n.25)).

The government alleges this procurement involves matters of national security because the vessel transports vital equipment and supplies to designated areas in support of combat operations  worldwide.  At the beginning of this Solicitation, on August 6, 2008, Air Force Major General Robert H. McMahon signed a statement of requirements for the United States Air Force's ("USAF") Prepositioned Ship Munitions program to replace the MV Fisher ("Fisher")[30] which is under lease that expires on September 14, 2009.  (AR 41-42.)  "[W]e must ensure an adequate replacement vessel is identified to continue USAF Afloat Prepositioned Fleet (APF) mission. . . . [The] [r]eplacement vessel must be on lease approximately 90-days prior to the [Fisher] lease expiration between 08 and 18 Jun 2009. . . [and] should be at [Military Ocean Terminal, Sunny Point, North Carolina] and ready to accept cargo [no later than] 18 Jun 2009." (AR 41-42.)  Sealift's delivery date has been pushed back to July 15th.

"Congress has recognized that, under certain circumstances, a protestor's right to contest a government procurement must give way.  Accordingly, in adjudicating bid protests this court must 'give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.'" *Datapath, Inc. v. United States*, 87 Fed. Cl. 162, __ (2009) (citing 28 U.S.C. § 1491(b)(3)).  *See North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").  National security concerns, however, must be balanced with the "'overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations.'" *See EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 18 (2008) (quoting *Hospital Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)).  *See also Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 650 (2007) (noting that allegations involving national security "must be evaluated with the same analytical rigor as other allegations of potential harm to the parties," but tailoring injunctive relief to avoid impinging upon national security); *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 402-03 (2008) (collecting cases); *Beta Analytics Int'l, Inc. v. United States*, 69 Fed. Cl. 431, 433

---

[30] The Fisher was on a 59-month contract awarded to Sealift, Inc.

(2005) (granting injunctive relief after giving due regard to interests of national security); *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 388 (2004) (limiting scope of sole-source procurement after giving due regard to interests of national security); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 655 (2003) (considering national security interests in weighing the balance of hardships between the parties, after having ruled in favor of plaintiff on the merits).

The government has represented in this case that the charter party contract is urgently needed to support the military world-wide. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must . . . demonstrate . . . that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and *. . . the public interest would not be disserved by a permanent injunction*.") (emphasis added). Accordingly, the court has determined that the interests of open and fair competition can not outweigh the interests of national defense and security.

The court concludes that national security concerns militate against equitable relief with immediate impact. However, given the long term nature of the options in the contract awarded, it is concluded that the interests involved can best be balanced if the contract award to Sealift is limited to the initial performance period and one option. The initial approximately 3.5 month contract period and the first one year option may proceed if the government so desires. Limiting the award to this performance period recognizes the present urgent defense needs that must be promptly met, but mandates a reprocurement to cure the award deficiencies at the earliest point feasible consistent with satisfying these present needs.

Red River represents that it is ready, willing and capable of performing within the original time constraints. To this end, MSC had the option to cancel the award to Sealift, and award the contract to Red River. Red River's representation is only feasible if such prompt corrective action was taken by MSC. It is concluded that national security needs now require limited performance by Sealift.

Because a new procurement will be needed after any limited performance by Sealift to meet urgent national security needs, Red River will have no opportunity to recover its bid costs on this procurement. Accordingly, these costs may be recovered in this litigation. The court rejects the government's position that equitable relief and

bid preparation costs cannot both be granted.  Congress empowered the court with discretion to award equitable relief and monetary relief limited to bid proposal costs. *See* 28 U.S.C. § 1491(b)(2) ("[T]he court[] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.").  The Federal Circuit emphasized that "the language of 28 U.S.C. § 1491(b)(2) . . . provides the Court of Federal Claims with discretion in fashioning relief." *PGBA,* 389 F.3d at 1226 (noting that the use of the permissive "'may'" grants discretion in this regard).  *See also Klinge Corp. v. United States*, No. 08-551C, 2009 WL 1766835, at *8 (Fed. Cl. April 27, 2009) (noting that "recent decisions of this court make clear that injunctive and monetary relief are not mutually exclusive"); *Ala. Aircraft Indus., Inc. v. United States*, 85 Fed. Cl. 558, 562-65 (2009) (awarding injunctive and monetary relief); *CNA Corp. v. United States*, 83 Fed. Cl. 1, 10-11 (2008) (same); *Geo-Seis Helicopters, Inc.*, 77 Fed. Cl. at 650 (same); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 334 (2003) (same); *MVM, Inc. v. United States*, 47 Fed. Cl. 361, 366 (2000) (same); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 573 (2000) (same).

## Admiralty issues

Initially, the court *sua sponte* questioned subject matter jurisdiction over this bid protest concerning a contract to hire a vessel for the carriage of cargo, citing *Asta Eng'g, Inc. v. United States*, 46 Fed. Cl. 674, 676 (2000).[31] *Red River Holdings, LLC v. United States*, 09-185C, 2009 WL 877319, at *2 (Fed. Cl. March 27, 2009).  The parties were requested to brief whether the exclusive admiralty jurisdiction of the federal district courts had precedence over the matters asserted.  *See, e.g., Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may

---

[31] In a previous matter, after the passage of ADRA, but before the sunset of the district court's bid protest jurisdiction, the undersigned concluded the particular action there stated was maritime, and dismissed that action for lack of subject matter jurisdiction. *Asta Eng'g, Inc. v. United States*, 46 Fed. Cl. 674, 676-77 & n.* (2000) ("In light of the long history of exclusive district court admiralty jurisdiction, over maritime contract matters, the Tucker Act amendments, codified in 28 U.S.C. § 1491(b), cannot be held to confer concurrent Suits in Admiralty Act jurisdiction on the United States Court of Federal Claims.  In short, absent specific legislation granting the United States Court of Federal Claims admiralty jurisdiction covering bid protests on maritime contracts, jurisdiction over the instant matter is lacking.").  *See also Bayship Mgmt., Inc. v. United States*, 43 Fed. Cl. 535, 536-37 (1999).

be challenged at any time by the parties or by the court *sua sponte.*"); *Consolidation Coal Co. v. United States*, 351 F.3d 1374, 1378 (Fed. Cir. 2003) ("under federal rules any court at any stage in the proceedings may address jurisdictional issues").  At a March 27, 2009 status conference, a  briefing schedule was established.

Red River's brief, filed April 7, 2009, insists subject matter jurisdiction over this bid protest resides exclusively in the United States Court of Federal Claims by virtue of the Tucker Act as amended by the Administrative Dispute Resolution Act ("ADRA"), 28 U.S.C. § 1491(b).  That exclusivity is not diminished, it is asserted, by the Suits in Admiralty Act or 28 U.S.C. § 1333, sources of the district courts' exclusive admiralty jurisdiction, neither of which expressly encompass bid protests. Red River emphasized that, while the contract awarded may be maritime, the claims made here do not arise out of the awarded maritime contract to which it is not a party (and Red River would have no standing to make any claims thereunder).  Rather, Red River's protest targets the activities preliminary to the maritime contract award, governed by statutes and regulations which require the application of procurement law, a matter within the particular expertise, and since 2001, exclusive jurisdiction, of this court.

Red River adds that to the extent there is any contractual root implicated in bid protest jurisdiction, it is an implied-in-fact contract for MSC to consider Red River's bid honestly and fairly, an obligation asserted to be preliminary to any maritime contract, and thus outside admiralty.

The government's brief, also filed on April 7, 2009, agrees that this is a bid protest, not a claim for breach of a maritime contract, and concurs that under ADRA, the United States Court of Federal Claims has exclusive subject matter jurisdiction to entertain bid protest actions concerning federal contracts for maritime services or supplies.

Following analysis of the parties' briefs and the authorities cited, by an Order, filed April 8, 2009, the court concluded there was subject matter jurisdiction  over this matter.  This Opinion furnishes the rationale for that conclusion.

The referenced maritime statutes implicated, and the exclusive federal district court jurisdiction thereunder, concern  maritime contracts.  Although it seeks one, Red River does not have a government maritime contract.  Rather, the bid protest

matter asserted is based on procurement statutes and regulations. Red River's Complaint alleges violation of the Administrative Procedure Act and of the Competition in Contracting Act. Thus, the nature and subject matter of the controversy is not maritime. *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991). The bid protest, like an implied contract for fair consideration of a bid, stands separate from the maritime contract sought by Red River and Sealift. *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983).

Neither party has suggested that bid protests exist in admiralty. Indeed, bid protests are relatively new judicial or congressional creations. Historically, a disappointed government contract bidder had no right to dispute the award of a contract to another. *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940) (holding that the Public Contracts Act was for the protection of the government, therefore, a disappointed bidder had no standing to challenge a contract award).

The Tucker Act, as amended by ADRA, 28 U.S.C. § 1491(b), grants jurisdiction to the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1079 (explaining that "Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims . . . to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions."); *Banknote Corp.*, 365 F.3d at 1350 ("The Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b)[.]"). Under ADRA, district court jurisdiction provided by 28 U.S.C. § 1491(b)(1) terminated on December 31, 2000, leaving the Court of Federal Claims as the exclusive forum for bid protests.

For the purposes of subject matter jurisdiction, a protest concerning the solicitation of a charter party – a ship and crew – falls into ADRA's third statutory category – violation of statute or regulation in connection with a procurement or proposed procurement (acquisition of goods or services by a federal agency, or the determination of the need therefore (*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008)), as opposed to the initial and broader categories enumerated – a solicitation by a federal agency for bids or proposals for a proposed

contract, or to a proposed award or the award of a contract.  As the government points out, Congress intended that ADRA would "'give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district court and the Court of Federal Claims. . . .'" (Dkt. 11 at 5 (citing 104 H. Rpt. 841 (Sept. 25, 1996).)  This statutory provision granted both federal district courts and the Court of Federal Claims jurisdiction over "the full range of cases previously subject to review in either system." 142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Levin).  *See Prineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed. Cir. 1988) (Forest Service's decision to reject responsive bid for sale of salvage timber was reviewable by Claims Court, citing Section 1491(a)(3)(1988)); *Mack Trucks, Inc. v. United States*, 6 Cl. Ct. 68 (1984) (bidder's challenge to Postal Service's decision to reject bid in solicitation for manufacture of trucks).  There is no indication that Congress intended to remove jurisdiction over protests concerning any category of government contracts.  Thus, the full protest jurisdiction which the Court of Federal Claims previously exercised pursuant to 28 U.S.C. § 1491(a), under the rubric of an implied contract for fair consideration of bids is retained and subsumed in the text of 28 U.S.C. § 1491(b).

The statutory jurisdictional grant extends to:

an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract <u>or</u> to a proposed award or the award of a contract <u>or</u> any alleged violation of statute or regulation <u>in connection with a procurement or a proposed procurement</u>.

28 U.S.C. § 1491(b)(1) (emphasis supplied).

The doctrine of the last antecedent, the use of the disjunctive "or," and the lack of a comma, restrict the qualifier "in connection with a procurement or a proposed procurement" to "any alleged violation of statute or regulation," and not to the earlier enumerated categories of  "solicitation by a Federal agency for bids or proposals for a proposed contract **or** to a proposed award or the award of a contract."  As the Federal Circuit explained in *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008):

referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the

meaning of the sentence for purposes of statutory construction.  Thus, this court has addressed this grammatical guideline referred to as the doctrine of the last antecedent. In *Anhydrides* [*& Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997)], a case without a contrary intention in the passage at issue, this court construed the qualifying phrase to apply only to the immediately preceding antecedent.

In contrast, when a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents.  But while the meaning of a statute will typically heed the commands of its punctuation, the doctrine of the last antecedent and its corollary, the rule of punctuation, are more guidelines than absolute rules.

523 F.3d 1323, 1336 (Fed. Cir. 2008) (citations, emphasis and internal quotations omitted).  In *Anhydrides*, in interpreting classification for tariff rates on imported products, the phrase "derived in whole or in part from maleic anhydride or from cyclohexane" was held to modify "succinic acid,"  because "succinic acid" was the last antecedent to "derived in whole or in part from maleic anhydride or cyclohexane," whereas "anhydride" appeared earlier in the sentence.  *See also Ruben v. Sec. of Dept. of Health & Human Servs.*, 22 Cl. Ct. 264, 266 (1991).

Accordingly, objections to federal solicitations for proposed contracts or objections to proposed or actual awards of contracts are cognizable in this court and are not limited to federal "procurement" of goods or services.  As the court observed in *Catholic University of America v. United States*, 49 Fed. Cl. 795, 799 (2001), prior to ADRA, this court's jurisdiction extended to both claims arising out of the government's disposition of assets as well as the acquisition of supplies or services "irrespective of whether the Government was engaged in the acquisition or the disposition of property."  *See Wetsel-Oviatt Lumber Co. v. United States*, 40 Fed. Cl. 557 (1998) (pre-award bid protest over the cancellation of a government timber sale).[32/]  The 28 U.S.C. § 1491(b) jurisdictional grant concerning solicitation for bids

---

[32/] Decisions indicating the bid protest jurisdiction of this court is restricted to "procurement" contracts fail to construe 28 U.S.C. § 1491(b)(1) as written and fail to recognize Congressional intent, in providing exclusive jurisdiction to the Court of Federal Claims, to maintain and subsume in the statutory grant, the previous inclusive jurisdiction exercised by that court over implied-in-fact contracts for fair consideration of bids submitted for all government contracts covered by the Tucker

(continued...)

or proposals for a proposed contract or a proposed award or award of a contract covers both procurement contracts and non-procurement contracts.

Similarly, in providing jurisdiction only to the Court of Federal Claims for all bid protests, there is no indication that Congress intended to omit protests concerning awards of maritime contracts.

Federal admiralty jurisdiction does not cover bid protests.  It promotes uniformity in treatment of vessels, which, by their nature, touch several jurisdictions. *The Lottawanna*, 88 U.S. 558 (1874).  No such broad interests are present in this protest.

The Federal Circuit has addressed the merits of navigational contract solicitations without jurisdictional reservations.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) (pre-award bid protest of contract to provide ferry service to Alcatraz Island in the Golden Gate National Recreation Area in San Francisco), *aff'g*, 70 Fed. Cl. 487 (2006); *Norfolk Dredging Co. v. United States*, 375 F.3d 1106 (Fed. Cir. 2004) (addressing merits of claim concerning eligibility of awardee of contract for dredging of Morehead City Inner Harbor, North Carolina).

Other cases in this court have addressed the merits of bid protests of solicitation and awards of contracts concerning, or at minimum relating to, maritime matters.[33] *OSG Prod. Tankers LLC v. United States*, 82 Fed. Cl. 570 (2008) (post-award of long-term charter of petroleum tankers for the Defense Energy Support Center); *Sealift, Inc. v. United States*, 82 Fed. Cl. 527 (2008) (bid protest over MSC tanker time charter); *Circle Line-Statue of Liberty Ferry, Inc. v. United States,* 76 Fed. Cl. 490 (2007) (protest of award of ferry service contract to the Statue of Liberty and Ellis Island); *Great Lakes Dredge & Dock Co.*, 60 Fed. Cl. 350; *Transatlantic*

---

[32](...continued)

Act, 28 U.S.C. § 1491(a).  If not so subsumed, the implied-in-fact contract for fair bid consideration would provide the jurisdictional basis for protests on the award of all contracts pursuant to 28 U.S.C. § 1491(a).  *KECO Indus., Inc. v. United States*, 492 F.2d 1200, 1203, 1205, 203 Ct. Cl. 566 (1974); *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 413-14, 135 Ct. Cl. 63 (1956).

[33]In this regard, it is recognized that it is a well established principle of interpretation that courts are "not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio.*"  *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952).

*Lines, LLC v. United States*, 68 Fed. Cl. 48 (2005) (post-award bid protest for solicitation for ocean transportation of military cargo between Florida and Guantanamo Bay); *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303 (2000) (post-award contract for offshore dredging of sand and placement on beach area and construction an offshore breakwater); *Marine Hydraulics Int'l, Inc. v. United States*, 43 Fed. Cl. 664 (1999) (Navy's award of a fixed price contract for the repair of a naval vessel); *W&D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638 (1997) (MSC solicitation for contracts to repair ships); *Mike Hooks, Inc. v. United States*, 39 Fed. Cl. 147, 149 (1997) (pre-award objections to solicitation for rental of a dredge to perform maintenance dredging in New Orleans Harbor). *See also L-3 Global Commc'n Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 605 (2008) (procuring satellite airtime and billing services for maritime communication terminals on Coast Guard vessels).

Deferring to this court's exclusive jurisdiction over all bid protests, some district court decisions – issued after the January 1, 2001 sunset provision – concluded jurisdiction was lacking and transferred the protest to the Court of Federal Claims. *Sealift, Inc. v. Reilly*, 496 F. Supp. 2d 52, 53-54 (D.D.C. 2007); *Sealift, Inc. v. United States*, 82 Fed. Cl. 527 (2008) (resolving merits of bid protest on transfer). *See generally Public Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30 (D.D.C. 2007) (court lacks jurisdiction over suit seeking relief from DSCP refusal to provide performance data to other procurement agencies, as this falls within the Court of Federal Claim's ADRA jurisdiction.) *Cf. Patriot Contract Servs. v. United States*, 388 F. Supp. 2d 1010, 1017 (N.D. Cal. 2005) (assuming jurisdiction over a maritime bid protest before the case was vacated by the Federal Circuit without reaching the merits), 154 F. App'x. 202 (Fed. Cir. 2005); *see Puglia Eng'g v. United States Coast Guard*, No. C 04-04794 CRB, 2005 WL 106785, at *5-6 (N.D. Cal. Jan. 18, 2005) (same district court judge assumed jurisdiction over maritime bid protest); *Am. Cargo Transp., Inc. v. United States*, No. C05-393JLR, 2007 WL 3326683 (W.D. Wash. Nov. 5, 2007) (ruling on the merits of a bid protest over contract for the shipment of vegetable oil to India).

While ADRA's grant of bid protest jurisdiction to the Court of Federal Claims is unlimited, the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.*, another jurisdictional fount, has an exception for maritime matters. 41 U.S.C. § 603. Accordingly, while protests over maritime procurements are exclusive to this court, subsequent disputes over the performance of the contract awarded, by the nature of

the maritime classification of the contract, fall into CDA's specific exception, and belong in a district court.  *Sw. Marine of San Francisco, Inc. v. United States*, 896 F.2d 532 (Fed. Cir. 1990).

Another waiver of sovereign immunity, the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, allows for suits against the United States for negligence.  An express exception is for admiralty cases under 28 U.S.C. § 2680(d). "[The chapter does not apply to] [a]ny claim for which a remedy is provided by chapter 309 or 311 of title 46 relating to claims or suits in admiralty against the United States."

In creating governmental tort and contract liability, Congress carved out admiralty matters.  No similar carve-out for bid protests has been identified. However, even in contractual disputes, any admiralty aspect must dominate in order for the carve-out or exception to apply.

Questions of the statutory basis for the grievances stated and the exclusivity of the Court of Federal Claims over bid protests aside, any contractual aspect present is incidental and insufficient to trigger admiralty jurisdiction.  Illustratively, *Marine Logistics, Inc. v. England*, 265 F.3d 1322, 1324 (Fed. Cir. 2001) was a voyage charter from Galveston, Texas to Almirante, Panama.  Under the contract, the government was liable for costs of loading and for liquidated damages for delays.  The claim for contractual liquidated damages was clearly "'arising out of maritime contracts'" and was maritime.  Accordingly, jurisdiction under the CDA was lacking and the matter was transferred pursuant to 28 U.S.C. § 1631.

In contrast, in *Sea-Land Services*, *Inc. v. Danzig*, the CDA maritime exclusion was held not to apply because most of the shipping orders at issue were not maritime, and any maritime aspects of the dispute were not readily severable.  *Sea-Land Serv., Inc. v. Danzig*, 211 F.3d 1373, 1378 (Fed. Cir. 2000).

Accordingly, the protest matters asserted herein are statutorily-based and within the exclusive jurisdiction of the Court of Federal Claims, not maritime contract claims.  Any maritime contractual underpinnings are incidental and not severable from the protest aspects asserted.

However, any contractual aspects of this matter, whether express or implied, are not maritime in nature or purpose, and are, at the most "preliminary" to a maritime

contract, in that Red River's objections concern the process of determining which competitor gets the contract award. *See Coastal Corp.*, 713 F.2d at 730 ("The implied contract to give bids 'fair and honest consideration' that the appellants assert the government breached, was preliminary and ancillary to any contract, express or implied, the government might enter into for goods or services. It was not itself such a contract, however.") (citing *KECO Indus., Inc. v. United States*, 492 F.2d 1200, 1203, 203 Ct. Cl. 566 (1974)).

Thus, the bid protest here is preliminary to a possible contract and lacks a maritime nature or purpose. *See Harley Mullion & Co. v. Caverton Marine Ltd.*, No. 08-cv-5435(BSJ), 2008 WL 4905460 (S.D.N.Y. 2008) (dismissing for lack of admiralty jurisdiction claim for brokerage commissions related to two charters). In *Maritima Petroleo E. Engenharia LTDA v. Ocean Rig 1 AS*, 78 F. Supp. 2d 162, 170 (S.D.N.Y. 1999), an agreement to procure contracts for the future use of defendant's offshore drilling rigs was held not to be admiralty. Any maritime contract was dependant upon the successful negotiation of a contract. If no contract was finalized, then there would be no obligation to furnish the rigs. *See also Kreatsoulas v. Freights of the Levant Pride*, 838 F. Supp. 147 (S.D.N.Y. 1993) (no admiralty jurisdiction, as purpose of assignment contract at issue was to provide collateral for a loan; nothing about the assignment was maritime in nature); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129 (2$^d$ Cir. 1998) (brokerage contract to procure charter party not maritime contract); *Fednav, Ltd. v. Isoramar, S.A.*, 925 F.2d 599 (2$^d$ Cir. 1991) (agreement to contribute to settlement of marine cargo claim not maritime contract); *Planned Premium Servs. of La., Inc. v. Int'l Ins. Agents, Inc.*, 928 F.2d 164 (5th Cir. 1991) (contract to finance marine insurance not maritime contract); *Exim Grain Trade, B.V. v. J.K. Int'l Pty Ltd.*, No. 08-cv-6989(WHP), 2008 WL 5191058 (S.D.N.Y. 2008) (contract for sale of wheat to be delivered to vessel not maritime contract); *Carter-Green-Redd, Inc. v. USS Cabot/Dedalo Museum Found.*, 756 F. Supp. 276 (E.D. La. 1991) (option to lease vessel not maritime contract).

Accordingly, it is concluded that, upon further consideration of the matter, the prior *Asta* decision reached the wrong result based upon the incorrect view that a bid protest on a maritime contract award had the same maritime character as the ensuing contract. Viewed correctly as a matter separate and distinct from the ensuing contract, the bid protest does not assume a maritime character and the exclusive jurisdiction  the Court of Federal Claims attained in 2001 correctly takes hold.

Accordingly, it is **ORDERED:**

1.  Counsel shall review this Opinion, prior to its release to the public free of the Protective Order, for competition-sensitive, proprietary, confidential or other protected information. Any proposed redactions in this Opinion are to be filed on or before **July 17, 2009**.

2.  If as stated in its Reply brief, Red River intends to claim bid preparation costs, leave is hereby granted to file a Second Amended Complaint to request such relief which shall be filed on or before **July 20, 2009**. Within **thirty (30) days** of any such filing, Red River shall provide the government with itemized and supportive evidence (invoices, statements and the like) of all costs asserted. The government shall then have an additional **thirty (30) days** to review the submissions and request any additional information or documents. Cooperation is anticipated in this informal exchange of data with the goal of reaching agreement as to the amount of recoverable costs, or at the minimum, that costs asserted are adequately supported from a books and records perspective. No later than the expiration of this sixty (60) day period, or sooner if the process outlined is completed earlier, the parties shall file a Joint Status Report suggesting further proceedings in this regard and a proposed schedule therefore.

3.  Red River's Motion for Judgment on the Administrative Record is **GRANTED in part.**

     a.  The court hereby declares the MSC's award of Solicitation No. N00033-08-R-3317 to Sealift, Inc. to have been arbitrary, capricious and to lack a rational basis.

     b. Given national security concerns, the award to Sealift, Inc. will not be ordered to be cancelled in total. Rather the award shall be limited to the initial performance period and one option and the government, its officers, agents, servants, employees and representatives shall take all appropriate action to proceed accordingly.

4.  The government's Cross-Motion for Judgment on the Administrative Record is **DENIED.**

5.  Entry of Judgment is **deferred** pending resolution of the additional filing opportunity granted to Red River.


s/ James F. Merow
James F. Merow
Senior Judge